IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
(EASTERN DIVISION)

| | |
|---|---|
| Bayer Schering Pharma AG and Bayer HealthCare Pharmaceuticals Inc. <br><br> Plaintiffs, <br><br> v. <br><br> Teva Pharmaceuticals USA, Inc., Barr Pharmaceuticals LLC, and Barr Laboratories, Inc. <br><br> Defendants. | Civil Action No. 1:10-cv-3697 <br><br> Judge Virginia M. Kendall <br><br> Presiding Magistrate Judge Morton Denlow <br><br> DEMAND FOR JURY TRIAL |

BAYER'S MEMORANDUM IN SUPPORT OF ITS MOTION
FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Peter B. Bensinger, Jr.
Adam K. Mortara
Paul J. Skiermont
Matthew R. Ford
BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
Courthouse Place, Suite 300
54 West Hubbard Street
Chicago, Illinois 60654

Tel.    (312) 494-4400
Fax    (312) 494-4440

Saul Perloff (*Pro Hac Vice pending*)
Katharyn Grant (*Pro Hac Vice pending*)
FULBRIGHT & JAWORSKI L.L.P.
300 Convent Street, Suite 2200
San Antonio, Texas 78205
Tel.    (210) 224-5575
Fax    (210) 270-7205

*Attorneys for Plaintiffs Bayer Schering
Pharma AG and Bayer HealthCare
Pharmaceuticals Inc.*

### TABLE OF CONTENTS

Table Of Contents ...................................................................................................... i

Table Of Authorities ................................................................................................ iii

Introduction .............................................................................................................. 1

Background ............................................................................................................... 2

Legal Standard ......................................................................................................... 6

Argument .................................................................................................................. 7

I.      This Court Should Restrain And Enjoin Teva From Continuing Its False
        Advertising And Infringing Offers To Sell Gianvi™ .................................. 7

        A.      Bayer Is Likely To Succeed On Its Lanham Act Claim ..................... 7

                1.      Teva's commercial advertising is literally false .................... 8

                2.      Because Teva's commercial advertising is literally false,
                        consumer deception is presumed ....................................... 10

                3.      Teva's misrepresentation is material .................................. 11

                4.      Teva's false advertising is made in interstate commerce,
                        and Bayer is likely to be injured by Teva's
                        misrepresentations ............................................................. 13

        B.      Bayer Is Likely To Succeed On Its Patent Infringement Claim .......... 14

                1.      An offer to sell an oral contraceptive product with "0.02
                        mg ethinyl estradiol stabilized by betadex in a clathrate
                        (molecular inclusion complex)" infringes claim 1 of the
                        '338 Patent ......................................................................... 15

                        a)      Teva's package insert describes an infringing
                                product .................................................................... 17

                        b)      Teva's package insert represents an offer of the
                                same betadex formulation as Bayer's YAZ® ............. 18

                2.      An offer to sell a patented product is infringement even if
                        an infringing sale will not necessarily occur ....................... 19

        C.      Bayer Will Suffer Irreparable Harm If The Court Does Not
                Restrain And Enjoin Teva ............................................................... 22

D.      The Balance of Harms Strongly Favors Bayer .......................................................26

E.      The Public Interest Weighs Heavily In Favor Of An Injunction ..........................27

Conclusion .............................................................................................................................28

# TABLE OF AUTHORITIES

## Cases

*3D Sys., Inc. v. Aarotech Labs., Inc.*,
   160 F.3d 1373 (Fed. Cir. 1998) ........................................................ 20

*Abbott Labs. v. Mead Johnson & Co.*,
   971 F.2d 6 (7th Cir. 1992) ...................................................... passim

*Abbott Labs. v. Sandoz, Inc.*,
   544 F.3d 1341 (Fed. Cir. 2008) ................................................ 23, 27

*Alpharma, Inc. v. Pennfield Oil Co.*,
   411 F.3d 934 (8th Cir. 2005) ......................................................... 9

*American Seating Co. v. USSC Group, Inc.*,
   514 F.3d 1262 (Fed. Cir. 2008) ................................................ 20, 22

*Avila v. Rubin*,
   84 F.3d 222 (7th Cir. 1996) ......................................................... 11

*B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.*,
   168 F.3d 967 (7th Cir. 1999). ................................................... 8, 10

*BASF Corp. v. Old World Trading Co., Inc.*,
   41 F.3d 1081 (7th Cir. 1994) ....................................................... 10

*BMC Resources, Inc. v. Paymentech, L.P.*,
   498 F.3d 1373 (Fed. Cir. 2007) .................................................... 20

*BorgWarner, Inc. v. Dorman Prods., Inc.*,
   No. 09-11602, 2009 WL 4885009 (E.D. Mich. Dec. 11, 2009) ............................ 16

*Cashmere & Camel Hair v. Saks*,
   284 F.3d 302 (1st Cir. 2002)........................................................ 12

*Canon, Inc. v. GCC Int'l, Ltd.*,
   263 Fed. Appx. 57 (Fed. Cir. 2008)............................................... 7, 26

*Duct-O-Wire Co. v. U.S. Crane, Inc.*,
   31 F.3d 506 (7th Cir. 1994) .......................................................... 6

*eBay, Inc. v. MercExchange, L.L.C*,
   547 U.S. 388 (2006)................................................................ 22

*Euromarket Designs, Inc. v. Crate & Barrel Ltd.*,
   96 F. Supp. 2d 824 (N.D. Ill. 2000) ................................................. 9

*FieldTurf Int'l, Inc. v. SprinTurf, Inc.,*
    433 F.3d 1366 (Fed. Cir. 2006) .................................................................. 21, 22

*Genderm Corp. v. Biozone Labs.,*
    No. 92 C 2533, 1992 WL 220638 (N.D. Ill. Sept. 3 1992)................................. 9, 11

*Healthpoint Ltd. v. Ethex Corp.,*
    273 F. Supp. 817 (W.D. Tex. 2001) ............................................................. 9

*Hot Wax, Inc. v. Turtle Wax, Inc.,*
    191 F.3d 813 (7th Cir. 1999) ................................................................... 8, 10

*Huntco Supply, LLC v. Starlite Media, LLC,*
    No. 07-CV-401-BR, 2009 WL 1108659 (D. Or. Apr. 21, 2009) ........................... 21

*Hyosung America, Inc. v. Sumagh Textile Co., Ltd.,*
    934 F. Supp. 570 (S.D.N.Y. 1996) .............................................................. 8

*In re Uranium Antitrust Litig.,*
    473 F. Supp. 393 (N.D. Ill. 1979) .............................................................. 13

*Instant Air Freight Co. v. C.F. Air Freight, Inc.,*
    882 F.2d 797 (3d Cir. 1989) ..................................................................... 24

*Int'l Kennel Club Inc. v. Mighty Star, Inc.,*
    846 F.2d 1079 (7th Cir. 1988) .................................................................. 22

*Int'l Profit Assocs., Inc. v. Paisola,*
    461 F. Supp. 2d 672 (N.D. Ill. 2006) .......................................................... 7

*Intergraph Corp. v. Intel Corp.,*
    195 F.3d 1346 (Fed. Cir. 1999) ................................................................. 7

*Kos Pharma., Inc. v. Andrx Corp.,*
    369 F.3d 700 (3d Cir. 2004) ................................................................... 26, 27

*Lawson Prods., Inc. v. Avnet, Inc.,*
    782 F.2d 1429 (7th Cir. 1986) .................................................................. 7

*Markman v. Westview Instruments, Inc.,*
    52 F.3d 967 (Fed. Cir. 1995) (*en banc*) ...................................................... 16

*Midlothian Labs., L.L.C. v. Pamlab, L.L.C.,*
    509 F. Supp. 2d 1065 (M.D. Ala. 2007) ...................................................... 12

*Mikohn Gaming Corp. v. Acres Gaming, Inc.,*
    165 F.3d 891 (Fed. Cir. 1998) .................................................................. 7

*Monsanto Co. v. Syngenta Seeds, Inc.*,
    503 F.3d 1352 (Fed. Cir. 2007) ................................................................. 16

*N. Am. Med. Corp. v. Axiom Worldwide, Inc.*,
    522 F.3d 1211 (11th Cir. 2008) ................................................................. 12

*Nat'l Basketball Ass'n v. Motorola, Inc.*,
    105 F.3d 841 (2d Cir. 1997) ...................................................................... 12

*Novartis Consumer Health, Inc. v. Johnson & Johnson*,
    209 F.3d 578 (3d Cir. 2002) .............................................................. passim

*Pizza Hut, Inc. v. Papa John's Int'l, Inc.*,
    227 F.3d 489 (5th Cir. 2000) ..................................................................... 11

*Promatek Indus., Ltd. v. Equitrac Corp.*,
    300 F.3d 808 (7th Cir. 2002) ............................................................... 7, 27

*Sanofi-Synthelabo v. Apotex, Inc.*,
    470 F.3d 1368 (Fed. Cir. 2006) ......................................................... 23, 28

*Schering-Plough Healthcare Prods., Inc. v. Schwarz Pharma, Inc.*,
    586 F.3d 500 (7th Cir. 2009) .................................................................... 10

*Standard Process, Inc. v. Total Health Discount, Inc.*,
    559 F. Supp. 2d 932 (E.D. Wis. 2008) ....................................................... 8

*Tate Access Floors, Inc. v. Interface Arch. Resources, Inc.*,
    279 F.3d 1357 (Fed. Cir. 2002) ................................................................ 14

*Titan Tire Corp. v. Case New Holland, Inc.*,
    566 F.3d 1372 (Fed. Cir. 2009) ................................................................ 15

*Upjohn Co. v. Schwartz*,
    246 F.2d 254 (2d Cir. 1957) ..................................................................... 27

*Vivid Tech. Inc. v. Am. Science & Engin. Inc.*,
    200 F.3d 795 (Fed. Cir. 1999) .................................................................. 16

*W.L. Gore & Assoc. v. Totes Inc.*,
    788 F. Supp. 800 (D. Del. 1992) ............................................................... 26

*Warren Corp. v. Goldwert Textile Sales, Inc.*,
    581 F. Supp. 897 (S.D.N.Y. 1984) ......................................................... 8, 9

*Zeneca Inc. v. Eli Lilly & Co.*,
    No. 1:99-cv-01452, 1999 WL 509471 (S.D.N.Y. July 19, 1999) ............... 26

## Federal Statutes

15 U.S.C. § 1116 ................................................................................................................. 2

15 U.S.C. § 1116(a) ............................................................................................................ 6

15 U.S.C. § 1125(a) ......................................................................................................... 2, 8

35 U.S.C. § 271 ................................................................................................................. 20

35 U.S.C. § 271(a) ........................................................................................................ 15, 20

35 U.S.C. § 283 ............................................................................................................... 2, 7

35 U.S.C. § 284 ................................................................................................................. 25

## Federal Rules

Fed. R. Civ. P. 65 ............................................................................................................... 2

## INTRODUCTION

This is a Lanham Act false advertising and patent infringement case.  Plaintiffs Bayer

Schering Pharma AG and Bayer HealthCare Pharmaceuticals Inc. (together, "Bayer") developed

the oral contraceptive YAZ®, which is the most popular oral contraceptive in the U.S. market.

Bayer is seeking a temporary restraining order and preliminary injunction to stop a generic

competitor's false advertising and patent infringement.

On June 1, 2010, defendants Teva Pharmaceuticals USA, Inc., Barr Pharmaceuticals

LLC, and Barr Laboratories, Inc. (together, "Teva") launched a generic version of YAZ® called

Gianvi™.  Both YAZ® and Gianvi™ contain the same active ingredients (3 mg of drospirenone

and 0.02 mg of ethinyl estradiol).  In low doses (like 0.02 mg) ethinyl estradiol is not stable and

can degrade.  Therefore, Bayer developed a patented formulation that protects ethinyl estradiol

within a cage of another molecule.  This formulation is called a "betadex clathrate."

While Teva was seeking FDA approval for Gianvi™, Teva twice told Bayer that its

generic product did not contain a betadex.  But Teva's Gianvi™ advertisements tell the market a

different story, as its package insert reveals:

> Gianvi™ (drospirenone and ethinyl estradiol tablets) 3 mg/0.02 mg provides an
> oral contraceptive regimen consisting of 24 active film-coated tablets each
> containing 3 mg of drospirenone and 0.02 mg of ethinyl estradiol **stabilized by
> betadex as a clathrate (molecular inclusion complex)** . . . .

(Ex. 1, Gianvi™ Package Insert 1 (emphasis added).)[1]

---

[1] Unless otherwise noted all "Ex." citations are to the Declaration of Adam K. Mortara In Support Of
Bayer's Motion For A Temporary Restraining Order And A Preliminary Injunction.  Ex. 1 contains both
the Gianvi™ package insert from the Teva website and a version with identical text from the National
Institutes of Health website.  Bayer provides both because the Gianvi™ package insert is not formatted
for 8.5 x 11 inch paper.  Pin cites are to the pagination of the NIH version.

After Teva's launch announcement, Bayer obtained Gianvi™ and subjected it to analytical testing.  Bayer discovered that Teva has falsely described its product to its customers.  Gianvi™ does not contain a betadex.

By advertising and promoting its product as having identical active ingredients **and** also YAZ®'s unique betadex formulation, Teva has falsely informed consumers, pharmacists, and the pharmaceutical supply chain that Gianvi™ is identical in all respects to YAZ®.  Teva's false statements violate Section 43(a) of the Lanham Act and have injured Bayer by preventing Bayer from counter-marketing against Gianvi™ on the basis of the betadex formulation.

Teva's offers to sell a betadex product also infringe Bayer's U.S. Patent No. 5,798,338 ("the '338 Patent") on the betadex formulation.  Even though Teva does not deliver on its false offers to sell a betadex product, the Patent Act provides that Teva's offers to sell directly infringe Bayer's patent.

Bayer respectfully moves the Court pursuant to §§ 34 and 43(a) of the Lanham Act, 15 U.S.C. §§ 1116 & 1125(a), 35 U.S.C. § 283, and Rule 65 for a temporary restraining order and preliminary injunction against Teva.  Bayer requests that the Court restrain and enjoin Teva from its false or misleading promotion of Gianvi™ as using a betadex formulation.  Bayer further requests that the Court order Teva to issue corrective advertising for Gianvi™ product already in the field.  If this Court does not restrain and enjoin Teva from its false advertising and patent infringement, Bayer will suffer irreparable harm as Teva sows confusion in the market, tarnishes YAZ®'s reputation as a unique oral contraceptive, and diverts sales.

## BACKGROUND

The FDA approved Bayer's YAZ® tablets as an oral contraceptive for the prevention of pregnancy and, in women who elect to use an oral contraceptive, for the treatment of moderate

acne and premenstrual dysphoric disorder.  (Ex. 2, YAZ® Package Insert 5 (Indications and Usage); *see also* Santini Decl. ¶ 2.)  YAZ® is a 28-day combined oral contraceptive regimen that contains 24 tablets with active ingredients plus 4 placebo tablets.  (*Id.* 1; Santini Decl. ¶ 2.)  Each YAZ® non-placebo tablet has two active ingredients: 3 mg of micronized drospirenone (a progestin), and 0.02 mg of micronized 17α-ethinyl estradiol (a synthetic estrogen).  (*Id.*; Santini Decl. ¶ 2.)

**Bayer Innovates The Use Of Betadex Clathrates In Oral Contraceptives**

Some pharmaceutical products degrade over time, particularly when exposed to oxygen. This impacts the stability of the product, making it less valuable to consumers and wholesalers. Bayer therefore dedicated research and development resources to improving the stability of its products, particularly its oral contraceptives.  These efforts resulted in the '338 patent.

Bayer's '338 patent discloses a method and pharmaceutical compositions "for reducing oxidative degradation of 17α-ethinyl estradiol comprising combining the estradiol with an effective amount of cyclodextrin, thus forming a cyclodextrin clathrate of the steroid."  (Ex. 3, '338 Patent Abstract.)  A "clathrate" is where one or more molecules form a "cage" around another molecule.  (Funke Decl. ¶ 4.)

The ethinyl estradiol in Bayer's YAZ® tablets is in a clathrate consisting of β-cyclodextrin, also known as "betadex."  (*Id.* ¶¶ 4-5; Ex. 4, YAZ® Product Monograph § 2.1.) The betadex in YAZ® protects the enclosed ethinyl estradiol molecule by stabilizing the active ingredient against oxidation.  (Ex. 4 § 2.1; Funke Decl. ¶ 5.)

YAZ®'s patented betadex formulation represents a significant advance in enhancing the stability of active ingredients and gives YAZ® a key competitive advantage.  (Santini Decl. ¶¶ 3, 8.)  Bayer has touted the stability YAZ® enjoys as a result of its patented technology.  (*See, e.g.*,

Ex. 4 §§ 1.1.2, § 2.1; Santini Decl. ¶ 8.)  Through Bayer's innovation and promotion of YAZ®'s

unique features, YAZ® has become one of the top selling oral contraceptives in the country.

**Teva Launches And Falsely Claims Gianvi™ Contains A Betadex**

Teva launched Gianvi™ onto the U.S. market on or about June 1, 2010.  (Ex. 5, New

Product Announcement, June 10, 2010 (introducing Gianvi™ as "AB rated and bioequivalent to

YAZ®* tablets").)  Teva markets Gianvi™ as a generic version of YAZ® to consumers and

pharmaceutical retailers and wholesalers throughout the United States, including Illinois.  (*Id.*;

Ex. 6, HDMA Standard Product Information; Santini Decl. ¶ 4.)  Gianvi™ is formulated with the

same active ingredients in the same amounts as YAZ®.  (*Compare* Ex. 2 *with* Ex. 1.)

On two earlier occasions, Teva represented to Bayer that Gianvi™ **would not** rely on

Bayer's patented betadex clathrate technology.  On December 28, 2006, Teva wrote to Bayer

certifying that its generic product would not infringe the claims of the '338 patent.

> BARR's ANDA product [Gianvi™] does not contain any cyclodextrin.  Therefore
> BARR's ANDA product will not meet this limitation of any of claims 1-14 of the
> '338 patent.

(Ex. 7, Letter from R. Millong to Berlex Labs., Inc. & Schering AG, Detailed Factual and Legal

Basis for Barr's Certification 3 (Dec. 28, 2006) ("2006 Paragraph IV Notice Letter").)[2]  Teva

then repeated this representation in 2007 when certifying its non-infringement of a different

patent not at issue here.  (Ex. 8, Letter from V. Capuano to Berlex Labs., Inc. & Schering AG,

Detailed Factual and Legal Basis for Barr's Certification 1 (Feb. 23, 2007) ("2007 Paragraph IV

Notice Letter") ("Barr's ANDA product [Gianvi™] does not include a cyclodextrin or a

cyclodextrin-estrogen complex.").)

---

[2] Plaintiffs Bayer HealthCare Pharmaceuticals Inc. and Bayer Schering Pharma AG were previously
named Berlex Labs and Schering AG, respectively.

As part of the FDA-approval process for its generic version of YAZ®, Teva submitted draft labeling to the FDA for Gianvi™.  The draft label the FDA approved for Teva's generic does not say that the ethinyl estradiol is in a betadex.  (*See* Ex. 9, FDA-Approved Teva Label (available at http://www.accessdata.fda.gov/drugsatfda_docs/label/2009/078515s000lbl.pdf).)

Contrary to its representations both to Bayer and the FDA, Teva's current package insert advertises Gianvi™ as containing "0.02 mg of ethinyl estradiol **stabilized by betadex as a clathrate** (molecular inclusion of complex) . . . ."  (Ex. 1 (emphasis added).)  This promotion is present in the first sentence of the "description" section of the package insert, below the Gianvi™ logo.  (*Id.*)  Teva distributes this advertisement with each and every one of the hundreds of thousands of packages of Gianvi™ now flooding the market.  Teva also displays this information on its website[3] as well as other national websites, including one maintained by the National Institutes of Health.[4]

In fact, Teva's representation that Gianvi™ employs Bayer's patented betadex stabilization technology is false.  Bayer developed an analytical test to detect the presence of betadex in a drug.  (Funke Dec. ¶ 6; *Id.* Ex. A.)  Bayer secured a sample of Gianvi™, and scientists at Bayer performed this test on the Gianvi™ sample.  (*Id.* ¶ 7.)  "This test was negative, indicating that the tested Gianvi™ product did not contain β-cyclodextrin at detectable levels." (*Id.* ¶ 8.)

---

[3] *See* http://www.tevausa.com/assets/base/products/pi/Gianvi_PI.pdf (a potential customer that clicks on a hyperlink on Teva's website for "prescribing information" in the "recent product launches" section of the website is taken to a document identical to Exhibit 1, stating that Gianvi™ contains "0.02 mg of ethinyl estradiol stabilized by betadex as a clathrate (molecular inclusion complex)") (last visited 6/15/2010).

[4] *See* http://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?id=18574 (echoing Teva's claim that Gianvi™ contains "0.02 mg of ethinyl estradiol stabilized by betadex as a clathrate (molecular inclusion complex)," and making PDF copy of package insert available that is identical to Exhibit 1) (last visited 6/15/2010).

Generic drug companies market their products as being just like brand drugs, only cheaper for consumers and more profitable for pharmacies and pharmaceutical wholesalers. (Santini Decl. ¶ 5.)  But while Gianvi™ has the same active ingredients as YAZ®, it lacks YAZ®'s enhanced stability.  Bayer's patented betadex clathrate technology makes this enhanced stability possible.  This should and would be Bayer's key marketing message to buyers upon the launch of a generic YAZ® product.  (*Id.* ¶ 8.)  But Teva's false and misleading statement that Gianvi™ contains a betadex disables Bayer from presenting this message.  (*Id.* ¶ 11.)  With the competitive playing field slanted in Teva's favor through its false advertisements, Bayer has no choice but to seek an immediate restraining order and preliminary injunction.

## LEGAL STANDARD

Section 34 of the Lanham Act, 15 U.S.C. § 1116(a), states that this Court has the "power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable," to prevent ongoing violations of § 43(a) of the Lanham Act.  Bayer must demonstrate:

(1)     That Bayer has "some likelihood of succeeding on the merits;" and

(2)     That Bayer has "no adequate remedy at law and will suffer irreparable harm if preliminary relief is denied."

*Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992) (internal quotation marks omitted).  If both elements are met, this Court also must consider:

(3)     Whether Teva will suffer irreparable harm "if preliminary relief is granted, balancing that harm against the irreparable harm to [Bayer] if relief is denied;" and

(4)     The "public interest, meaning the consequences of granting or denying the injunction to non-parties."

*Id.*; *Duct-O-Wire Co. v. U.S. Crane, Inc.*, 31 F.3d 506, 509 (7th Cir. 1994).  "Sitting as a court of equity, the court then weighs all these factors employing a sliding-scale approach."  *Promatek*

*Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 811 (7th Cir. 2002).  "That is, the more likely the plaintiff's chance of success on the merits, the less the balance of harms need weigh in its favor." *Id.*  This analysis is "subjective and intuitive, one which permits district courts to 'weigh the competing considerations and mold appropriate relief.'"  *Abbott Labs.*, 971 F.2d at 12 (quoting *Lawson Prods., Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1436 (7th Cir. 1986)).[5]

The Patent Act permits this Court to "grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable."  35 U.S.C. § 283.  The Federal Circuit applies regional circuit law to supply the standard for the grant of preliminary injunctive relief and Federal Circuit law on issues specific to patent law.  *See Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1352 (Fed. Cir. 1999); *Mikohn Gaming Corp. v. Acres Gaming, Inc.*, 165 F.3d 891, 894 (Fed. Cir. 1998). Therefore, the Seventh Circuit's sliding scale approach applies to both of Bayer's claims (false advertising and patent infringement).  *Cf. Canon, Inc. v. GCC Int'l, Ltd.*, 263 Fed. Appx. 57, 62-63 (Fed. Cir. 2008) (citing Seventh Circuit sliding scale test with approval).

## ARGUMENT

## I.   THIS COURT SHOULD RESTRAIN AND ENJOIN TEVA FROM CONTINUING ITS FALSE ADVERTISING AND INFRINGING OFFERS TO SELL GIANVI™

### A.   Bayer Is Likely To Succeed On Its Lanham Act Claim

Section 43(a) of the Lanham Act provides for a civil action against a party who "uses in commerce any . . . false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics,

---

[5] The standard applies for both the grant of a temporary restraining order and a preliminary injunction. *See Int'l Profit Assocs., Inc. v. Paisola,* 461 F. Supp. 2d 672, 675-76 (N.D. Ill. 2006).

qualities, or geographic origin of his or her or another person's goods, services, or commercial

activities . . . ."  15 U.S.C. § 1125(a).  There are five elements to a false advertising claim:

(1)     a false statement of fact by the defendant in a commercial advertisement
        about its own or another's product;

(2)     the statement actually deceived or has the tendency to deceive a
        substantial segment of its audience;

(3)     the deception is material, in that it is likely to influence the purchasing
        decision;

(4)     the defendant caused its false statement to enter interstate commerce; and

(5)     the plaintiff has been or is likely to be injured as a result of the false
        statement, either by direct diversion of sales from itself to defendant or by
        a loss of goodwill associated with its products.

*Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 819 (7th Cir. 1999); *B. Sanfield, Inc. v. Finlay*

*Fine Jewelry Corp.*, 168 F.3d 967, 971 (7th Cir. 1999).  Bayer's claim satisfies all five elements.

### 1.     Teva's commercial advertising is literally false

Teva advertises on its website, the websites of others, and in every package of Gianvi™

that its product contains "0.02 mg of ethinyl estradiol stabilized by betadex as a clathrate

(molecular inclusion of complex) . . . ."  (Ex. 1, Gianvi™ Package Insert 1; *supra* fn. 3-4).  In

fact, Gianvi™ does not contain a betadex.  (Funke Decl. ¶¶6-8.)  Teva's representation is

commercial advertising, and it is literally false.

Advertising "'is not limited to newspaper, television or radio announcements; any notice

addressed to the public serves the same purpose.'"  *Hyosung America, Inc. v. Sumagh Textile*

*Co., Ltd.*, 934 F. Supp. 570, 580 (S.D.N.Y. 1996) (quoting *Warren Corp. v. Goldwert Textile*

*Sales, Inc.*, 581 F. Supp. 897, 900 (S.D.N.Y. 1984)).  Teva's website and internet advertising

meets this definition.  *See, e.g.*, *Standard Process, Inc. v. Total Health Discount, Inc.*, 559 F.

Supp. 2d 932, 940 (E.D. Wis. 2008) (denying summary judgment against Lanham Act claim that

statement on website constituted false advertising); *Euromarket Designs, Inc. v. Crate & Barrel Ltd.*, 96 F. Supp. 2d 824, 831 (N.D. Ill. 2000) ("The website is a form of commercial advertising or promotion" for Lanham Act jurisdictional analysis.).

Teva's physical Gianvi™ package inserts also constitute "advertisements" for purposes of the Lanham Act.  *See Warren Corp. v. Goldwert Textile Sales, Inc.*, 581 F. Supp. 897, 900 (S.D.N.Y. 1984) ("[F]alse descriptions of a product, contained in the product's label, share with newspaper advertisements and television and radio commercials the ability to engender consumer confusion both as to the origin and content of that product.").  Prescription product labeling constitutes advertising under the Lanham Act.  *Genderm Corp. v. Biozone Labs.*, No. 92 C 2533, 1992 WL 220638, at *2 (N.D. Ill. Sept. 3 1992) (entering preliminary injunction and requiring recall of defendant's product with false statement regarding active ingredient in labeling); *see also Alpharma, Inc. v. Pennfield Oil Co.*, 411 F.3d 934, 937-38 (8th Cir. 2005) (reinstating claims that defendants' advertisements and labels falsely promoted antibiotic as FDA approved); *Healthpoint Ltd. v. Ethex Corp.,* 273 F. Supp. 817, 846-47 & n.141 (W.D. Tex. 2001) (sustaining Lanham Act claim that prescription ointment label falsely advertised that product had $1.1 \times 10^6$ USP units of papain).  Bayer marketing expert Richard Wartel attests that the package insert is important "in promoting and offering a new generic for sale."  (Wartel Decl. ¶¶ 15, 18.)

When drug labeling falsely describes the contents or characteristics of a drug, that is a Lanham Act violation.  In *Novartis Consumer Health, Inc. v. Johnson & Johnson*, 209 F.3d 578, 590 (3d Cir. 2002), the court affirmed an injunction preventing J&J from advertising its antacid with the name "Night Time Strength."  The Court held that the name necessarily implied that J&J's product was specially formulated to work at night, but that testing did not substantiate such

9

a claim. *Id.* Here, Teva's false claim is more egregious; Teva claims that its product has an ingredient in its formulation when it does not.

### 2. Because Teva's commercial advertising is literally false, consumer deception is presumed

A plaintiff may establish liability if "the challenged advertisement is literally false, or, if literally true or ambiguous, that it is misleading in context, as demonstrated by actual customer confusion." *BASF Corp. v. Old World Trading Co., Inc.*, 41 F.3d 1081, 1089 (7th Cir. 1994) (internal quotation marks omitted). Literally false advertisements are presumptively deceptive. *B. Sanfield*, 168 F.3d at 971. Thus, "[w]hen the statement in question is actually false, the plaintiff need not show that the statement either actually deceived customers or was likely to do so." *Hot Wax*, 191 F.3d at 820; *see also BASF*, 41 F.3d at 1089; *Abbott*, 971 F.2d at 14.

Context determines literal falsity. In *Abbott*, defendant Mead Johnson formulated its pediatric electrolytic maintenance solution "Ricelyte" from rice syrup solids. The medical community considered a rice-based electrolytic solution superior to Abbott's glucose-based formula, and Mead Johnson focused its advertising on promoting Ricelyte's formulation as "rice-based." Abbott argued that Ricelyte did not contain rice carbohydrates as physicians understood that concept. The trial court held that Mead Johnson's advertisements were literally false, and the Seventh Circuit upheld that finding. 971 F.2d at 14. Because the advertisements were literally false, the Seventh Circuit explained that "Abbott need not present evidence of actual confusion to prevail on the merits." [6] *Id.*

---

[6] In *Schering-Plough Healthcare Prods., Inc. v. Schwarz Pharma, Inc.*, 586 F.3d 500 (7th Cir. 2009), the Seventh Circuit addressed this issue again and explained that some "literally false" statements could not be deceptive because no one could be "fooled." *See id.* at 512 ("When the Soviet Union in the 1930s declared that '2 + 2 = 5,' it was not deceiving anyone; it was announcing a slogan designed to spur workers to complete the Five-Year Plan in four years.").

Drug labels are not the place for "puffery" or propaganda.  Bayer and Teva's customers have to rely on the truthfulness of Teva's advertising and its package insert.  (Wartel Decl. ¶ 15.) Those customers include "drugs wholesalers, retail pharmacy chains, managed care organizations, pharmacy benefit managers, state Medicaid agencies and others."  (Santini Decl. ¶ 11.)  Teva's false statement that Gianvi™ embodies Bayer's patented betadex technology is not puffery; it is not a vague or fanciful statement unintended to convey factual information. Teva presents its false statement in the context of assuring buyers that Gianvi™ contains the same ingredients and formulation as YAZ®.  Teva's false statement eliminates a competitive advantage YAZ® has over Gianvi™.  Teva's package insert is literally false, and this Court should therefore presume consumer deception.  *Abbott*, 971 F.2d at 14.

### 3.    Teva's misrepresentation is material

In the Seventh Circuit, literally false statements also give rise to a presumption of materiality.  *See Avila v. Rubin*, 84 F.3d 222, 227 (7th Cir. 1996) ("The general rule is that if a statement is literally false, the court may grant relief **without reference to the reaction of buyers or consumers of the product**.") (emphasis added); *Genderm*, 1992 WL 220638, at *2 ("[A]s the magistrate judge correctly held, false statements are presumed to be material."); *see also Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 497 (5th Cir. 2000) ("With respect to materiality, when the statements of fact at issue are shown to be literally false, the plaintiff need not introduce evidence on the issue of the impact the statements had on consumers.") (citing *Avila*, 84 F.3d at 227).

Even though the Seventh Circuit recognizes that Bayer need not provide evidence of materiality where there is a literally false statement like Teva's, the evidence here shows that Teva's betadex misrepresentation is material.

"One method of establishing materiality involves showing that the false or misleading statement relates to an 'inherent quality or characteristic' of the product." *Cashmere & Camel Hair v. Saks*, 284 F.3d 302, 311-12 (1st Cir. 2002) (quoting *Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 855 (2d Cir. 1997)).  The qualities and characteristics of medical devices and pharmaceuticals are near-*per se* material.  *See, e.g.*, *N. Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1226 (11th Cir. 2008) (false representations regarding physiotherapeutic spinal device, including manufacturer's purported affiliation with NASA and product's alleged FDA approval, "logically would influence a doctor's decision to purchase the DRX 9000 over a competing machine without those qualities"); *Midlothian Labs., L.L.C. v. Pamlab, L.L.C.*, 509 F. Supp. 2d 1065, 1091 (M.D. Ala. 2007) (materiality of false claim of bioequivalence was "easily established"), *modified on other grounds upon reconsideration*, 509 F. Supp. 2d 1095 (M.D. Ala. 2007).

YAZ®'s use of a betadex to stabilize its active ingredient ethinyl estradiol is a defining feature of the product.  As Bayer HealthCare's Vice President of Manager Markets Alex Santini attests:

> One key benefit offered by YAZ® is its extraordinary stability resulting from the use of betadex in its formulation.  The use of betadex in YAZ® is a unique benefit not associated with other oral contraceptive products.  Because of its extraordinary stability, wholesalers can purchase YAZ® with confidence that they will be able to sell the product before it goes out of date and that the product is more stable than products that do not use betadex.  Patients can be confident that they are purchasing a high quality product that resists degradation and loss of efficacy.  This is especially important in the oral contraceptive market, where products must be highly effective.

(Santini Decl. ¶ 8.)

By claiming to use Bayer's patented betadex clathrate stabilization technology, Teva falsely represents that a β-cyclodextrin cage protects the ethinyl estradiol in Gianvi™.  This is an

12

"inherent quality or characteristic" of the product and therefore material. As a judge of this Court explained, the Lanham Act "should be read, at minimum, to protect competitors from misrepresentations which a defendant makes about its own products and which relate to the principal bases of competition among sellers." *In re Uranium Antitrust Litig.*, 473 F. Supp. 393, 408 (N.D. Ill. 1979) (competitor's misrepresentation of its ability to supply uranium to market was "material" and actionable). A wholesaler or consumer faced with the decision of purchasing YAZ® or Gianvi™ considers two products having the same active ingredients in the same amounts, with the brand being more expensive than the generic. But YAZ® is better because it incorporates a patented formulation that improves its stability. Teva's misrepresentation that Gianvi™ also has this feature forecloses Bayer's ability to compete with Teva on the basis of this important comparison. (Santini Decl. ¶¶ 11-14.) Such a misrepresentation is material.

> **4.** **Teva's false advertising is made in interstate commerce, and Bayer is likely to be injured by Teva's misrepresentations**

Teva offers Gianvi™ in interstate commerce, and hundreds of thousands if not millions of Gianvi™ package inserts are scattered across the country. Teva has placed Gianvi™ in the national pharmaceutical supply chain. (Ex. 6, HDMA Standard Product Information; Wartel Decl. ¶ 18.)

By falsely advertising Gianvi™, Teva has already diverted sales of YAZ® to sales of its own product. As Mr. Santini attests:

> In contract negotiations with Bayer customers, some customers have already declined to extend or renew purchase agreements with Bayer for YAZ® because of the availability of Gianvi. Lacking clear and effective means of communicating YAZ®'s superior quality and stability resulting from its betadex formulation, or counteracting Teva's message that Gianvi™ is the same as YAZ® in all key respects, Bayer has little hope of ever recovering the market share it previously maintained.

(Santini Decl. ¶13.)  If this Court does not stop Teva from falsely advertising Gianvi™ and does not order Teva to correct the false package inserts in the field, Bayer faces the prospect of significant market share loss.  "Following the launch of a generic product, market share of the brand quickly erodes as pharmacies begin substituting the generic in place of prescriptions written for the brand."  (*Id.* ¶ 5; *see also* Wartel Decl. ¶¶ 20-21.)  To salvage market share, "branded drug companies must be able to move quickly to point their customers to key differences between the brand and generic, i.e., to show their customers that despite the similarities in the products, the brand product continues to offer significant features and benefits not provided by the generic product."  (Santini Decl. ¶ 6.)  Without an immediate restraining order and an injunction, Bayer's loss of market share will be irreversible.  (*Id.* ¶ 14.)

This is not a close case.  Teva chose to advertise Gianvi™ with the literally false message that Teva's product uses the same patented betadex clathrate stabilization technology as YAZ®.  This deception is material, it has already injured Bayer, and that injury will continue unless and until Teva is ordered to stop its false advertising and correct its false statements.  Bayer has a strong likelihood of success on its § 43(a) Lanham Act false advertising claim.

## B.   Bayer Is Likely To Succeed On Its Patent Infringement Claim

To show likelihood of success on the merits, a patentee moving for a preliminary injunction "must show that, in light of the presumptions and burdens applicable at trial, it will likely prove that [the accused product] infringes the asserted claims of the [] patent and that the patent will likely withstand [the defendant's] challenges to its validity."  *Tate Access Floors, Inc. v. Interface Arch. Resources, Inc.*, 279 F.3d 1357, 1365 (Fed. Cir. 2002).  However, "if a patentee moves for a preliminary injunction and the alleged infringer does not challenge validity, the very existence of the patent with its concomitant presumption of validity satisfies the patentee's burden of showing a likelihood of success on the validity issue."  *Titan Tire Corp. v.*

*Case New Holland, Inc.*, 566 F.3d 1372, 1377 (Fed. Cir. 2009).  Because Bayer's patent is

presumed valid and Teva has yet to present an invalidity challenge, Bayer will confine its

analysis to the issue of infringement.[7]

Teva's offers to sell Gianvi™ with the false prescribing information infringes Bayer's

'338 patent, which covers pharmaceutical compositions that use betadex to stabilize ethinyl

estradiol.  Teva transmitted its false package insert to wholesalers as part of its initial launch

communications for Gianvi™, and thus Teva offered to sell the product that label describes.

(Wartel Decl. ¶¶ 15, 18.)  These offers infringe Bayer's '338 patent because Teva "without

authority makes, uses, **offers to sell**, or sells [Bayer's] patented invention . . . ."  35 U.S.C.

§ 271(a) (emphasis added).  Even though Teva's label is false and Teva does not actually deliver

Gianvi™ with the betadex ingredient, Teva's offers to sell still constitute direct infringement of

Bayer's '338 patent.  An offer to sell can infringe even where the consummated sale does not.

> **1.     An offer to sell an oral contraceptive product with "0.02 mg ethinyl estradiol stabilized by betadex in a clathrate (molecular inclusion complex)" infringes claim 1 of the '338 Patent**

Claim 1 of the '338 Patent covers:

> A pharmaceutical composition comprising
>
> [1] an effective amount of 17α-ethinyl estradiol
>
> [2] and an amount of a β-cyclodextrin which is effective in reducing the oxidative degradation of the 17α-ethinyl estradiol
>
> [3] wherein the composition is a clathrate.

(Ex. 3, '338 patent col. 4, lines 6-10.)

---

[7] Teva twice had the opportunity to present invalidity arguments when it applied for FDA approval and sent Bayer a notice letter related to its application for FDA approval.  Teva did not present any arguments that Bayer's '338 patent is invalid on either occasion.  (*See* Exs. 7-8, *supra.*)

"An infringement analysis entails two steps.  The first step is determining the meaning and scope of the patent claims asserted to be infringed.  The second step is comparing the properly construed claims to the device accused of infringing."  *Monsanto Co. v. Syngenta Seeds, Inc.*, 503 F.3d 1352, 1356 (Fed. Cir. 2007) (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (*en banc*)) (internal quotation marks omitted).

However, in preliminary injunction proceedings claim construction is unnecessary unless the parties dispute the scope of the claims.  *See BorgWarner, Inc. v. Dorman Prods., Inc.*, No. 09-11602, 2009 WL 4885009, at *2 & n.1 (E.D. Mich. Dec. 11, 2009) (granting preliminary injunction and rejecting infringer's argument that plaintiff had not engaged in a proper claim construction analysis) (citing *Vivid Tech. Inc. v. Am. Science & Engin. Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999) ("[O]nly those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy.")).  Bayer does not anticipate that Teva will dispute the meaning of the claim terms here, and therefore no construction is necessary.[8]

The next step in the infringement analysis is the comparison of Teva's offer to sell Gianvi™ to the asserted claim.  Teva's offer to sell Gianvi™ as communicated in its launch materials and package insert infringes the '338 patent both because (a) it alone establishes an offer to sell an embodiment of claim 1 of the '338 patent, and (b) it conveys the message that Teva's ethinyl estradiol betadex formulation is the same as Bayer's YAZ® formulation, which in fact practices claim 1 of the '338 patent.

---

[8] To the extent that Teva offers argument on claim construction, Bayer will respond to those arguments with its own proffered constructions as necessary.

**a)      Teva's package insert describes an infringing product**

The first element of claim 1 requires that the product contain "an effective amount of 17α-ethinyl estradiol."  Gianvi™'s package insert states that it contains "0.02mg of ethinyl estradiol."  (Ex. 1, Gianvi™ Package Insert 1.)  "Ethinyl estradiol" and "17α-ethinyl estradiol" are synonyms.  (Funke Decl. ¶4.)  And Gianvi™'s package insert conveys that the amount of ethinyl estradiol is "effective" by stating that the product has an indication for oral contraception. (Ex. 1, Gianvi™ Package Insert 1, 3.)

The second element of claim 1 requires "an amount of a β-cyclodextrin which is effective in reducing the oxidative degradation of the 17α-ethinyl estradiol."  Gianvi™'s package insert states that Gianvi™ contains "0.02mg of ethinyl estradiol **stabilized by betadex**." (*Id.* 1 (emphasis added).)  "Betadex" and "β-cyclodextrin" are synonyms.  (Funke Decl. ¶ 4.)  Teva's statement that the ethinyl estradiol in Gianvi™ is "stabilized by betadex" satisfies claim 1's requirement that the betadex "is effective in reducing the oxidative degradation" of the ethinyl estradiol.  This is because the primary threat to the stability of ethinyl estradiol in a packaged combined oral contraceptive (*ex vivo*) as opposed to in the body (*in vivo*) is the threat of oxidative degradation.  (*Id.* ¶ 5; '338 patent col. 1, lines 21-24.)  Indeed, betadex clathrates of ethinyl estradiol are not known to reduce any kind of instability other than oxidative degradation. (Funke Decl. ¶ 5.)  Therefore, Teva's offer to sell a product with "ethinyl estradiol stabilized by betadex" is an offer to sell a product with "an amount of a β-cyclodextrin which is effective in reducing the oxidative degradation of the 17α-ethinyl estradiol."

Finally, the third element of the claim states that "the composition is a clathrate."  A clathrate is a type of multi-molecular complex where one molecule sits inside of a large cage molecule.  (*Id.* ¶4.)  Here, the ethinyl estradiol sits inside a betadex cage, and Gianvi™'s package insert offers a product that is a "clathrate (molecular inclusion complex)."  (Ex. 1,

Gianvi™ Package Insert 1.)  As a result, each limitation of claim 1 is present in Teva's offer to sell Gianvi™.

### b) Teva's package insert represents an offer of the same betadex formulation as Bayer's YAZ®

Teva's package insert contains the identical statement about ethinyl estradiol and betadex as Bayer's YAZ® package insert.  While the Gianvi™ package insert is false, Teva's copying of Bayer's language further constitutes an offer to sell a product that is identical to YAZ® in this respect.  (*Cf.* Wartel Decl. ¶ 14 ("a generic company attempts to establish how its product is the same (equivalent to) the brand.").)  Therefore, evidence that YAZ® embodies claim 1 of the '338 patent provides further evidence that Teva's offer to sell infringes.

YAZ® embodies claim 1 of the '338 patent.  Like Gianvi™, YAZ® contains an effective amount of ethinyl estradiol.  And just as Teva describes Gianvi™ in its offer of sale, YAZ®'s ethinyl estradiol is "stabilized by betadex in a clathrate."  (Ex. 2, YAZ® Package Insert.)  Bayer has conducted testing comparing the stability of ethinyl estradiol without a betadex to the stability of its betadex formulation for YAZ®.  (Ex. 10, Bayer Schering Report A06567 19.)  This study found that the betadex formulation (called SH T00186D) outperformed the non-betadex formulation in stability testing (by retaining a greater percentage of its ethinyl estradiol over time):

no betadex →

← betadex

Table 1:   Content of ethinyl estradiol (EE) and drospirenone (DRSP) in SH T00186A and SH T00186D, stored at 25 °C/60 % RH and 40 °C/75 % RH (data by Pharmalabor), (specification = 90 - 105%)

| time (months) | SH T00186A (batch no. AC032) | | | | SH T00186D (batch no. AC034) | | | |
|---|---|---|---|---|---|---|---|---|
| | 25 °C / 60 % RH | | 40 °C / 75 % RH * | | 25 °C / 60 % RH | | 40 °C / 75 % RH * | |
| | EE (%) | DRSP (%) | EE (%) | DRSP (%) | EE (%) | DRSP (%) | EE (%) | DRSP (%) |
| 0 | 96.1 | 97.7 | 96.1 | 97.7 | 101.0 | 100.0 | 101.0 | 100.0 |
| 1 | n.d. | n.d. | 95.1 | 99.1 | 101.0 | 99.9 | 101.4 | 100.3 |
| 3 | 96.3 | 98.5 | 86.8 | 97.9 | 100.2 | 99.9 | 100.0 | 100.3 |
| 6 | 96.4 | 98.7 | 80.2 | 98.8 | 100.0 | 99.0 | 99.7 | 99.9 |
| 9 | 95.6 | 98.5 | --- | --- | 103.2 | 100.6 | --- | --- |
| 12 | n.d. | n.d. | --- | --- | 101.7 | 100.5 | --- | --- |

n.d. = not determined,   * terminated after 6 months

(Ex.10, Bayer Schering Report A06567 35 Table 1.)

(*See also id.* 19 ("The data clearly demonstrates improved stability for SH T00186D and justifies the use of ethinyl estradiol-β-cyclodextrin-clathrate in the tablet formulation.").)

Thus, the betadex in Bayer's YAZ® is "effective in reducing the oxidative degradation of the 17α-ethinyl estradiol," as stated in claim 1 of the '338 patent.  By using identical language from YAZ®'s package insert to offer Gianvi™ ("stabilized by betadex in a clathrate"), Teva has made an offer to sell a product that embodies claim 1 of the '338 patent.  Therefore, Teva's offers to sell Gianvi™ infringe the '338 patent.

## 2.      An offer to sell a patented product is infringement even if an infringing sale will not necessarily occur

As stated above, Teva has offered to sell Gianvi™ with a betadex through false and misleading package inserts.  Even though Teva cannot consummate an infringing sale, the law is that its offers to sell are still direct infringement of the '338 patent.

First, the text and purpose of the statute establish that an "offer[] to sell" is a distinct act of infringement from a sale:

> Except as otherwise provided in this title, whoever without authority makes, uses, **offers to sell**, **or** sells any patented invention, within the United States, or imports into the United States any patented invention during the term of the patent therefor, infringes the patent.

19

35 U.S.C. § 271(a) (emphases added).  The Patent Act's use of the disjunctive "or" means that an offer to sell is direct infringement even in the absence of an infringing sale.  The addition of the "offers to sell" language to § 271(a) "represents a distinct change to the bases for patent infringement, because liability arose previously only as the result of an actual sale."  *3D Sys., Inc. v. Aarotech Labs., Inc.*, 160 F.3d 1373, 1378-79 (Fed. Cir. 1998).  "One of the purposes of adding 'offer[] to sell' to § 271(a) was to prevent . . . generating interest in a potential infringing product to the commercial detriment of the rightful patentee."  *Id.* at 1379.

Courts have permitted patentees to collect damages for offers to sell infringing products even where the infringer -- like Teva here -- ultimately delivered non-infringing products in a "bait and switch."  In *American Seating Co. v. USSC Group, Inc.*, 514 F.3d 1262 (Fed. Cir. 2008), the accused infringer offered to sell infringing product but then substituted non-infringing product without the consent of the customer.  *Id.* at 1269-70.  The Federal Circuit affirmed an award of lost profits damages even on the sales of the non-infringing products because "it sufficed for the jury to assume that [the defendant] offered the VPRo I [the infringing product] for sale and then substituted the non-infringing VPRo II – a bait-and-switch – and to find that absent USSC's offer to sell the VPRo I, the sales would have gone to American Seating."  *Id.* at 1270.

As in the lost profits context, courts have held that infringing sales need not occur for an offer to sell to constitute infringement for which a patentee can collect a reasonable royalty.

> Although Huntco may not have sold any BikePods to date, Lueken testified Huntco has offered the BikePod for sale and engaged in marketing efforts that have caused confusion between BikePod and BikeLid products. **Offering a patented invention for sale is sufficient conduct under 35 U.S.C. § [2]71 to infringe a patent**. *See BMC Resources, Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1380 (Fed. Cir. 2007) ("[L]iability for infringement requires a party to make, use, sell, or offer to sell the patented invention."). As noted, the Court must award at least a reasonable royalty if infringement has occurred.

20

*Huntco Supply, LLC v. Starlite Media, LLC*, No. 07-CV-401-BR, 2009 WL 1108659, at *7 (D. Or. Apr. 21, 2009) (emphasis added).

The Federal Circuit has addressed a scenario like this one, where the defendant made an offer to sell a patented product without the ability to deliver an infringing product. In *FieldTurf Int'l, Inc. v. SprinTurf, Inc.*, 433 F.3d 1366 (Fed. Cir. 2006), the defendant submitted a bid in response to a school district's request for proposal (RFP) that included specifications that the plaintiff's patent covered. Prior to submitting its bid, the defendant informed the school district that its product would not conform to the request for proposal because its product was different than the plaintiff's patented features. *Id*. at 1368-69. The school district told the defendant to "'do the best it could' and submit a bid anyway." *Id*. at 1369. The defendant had also demonstrated the differences between its product and the plaintiff's patented features prior to submitting its bid. *Id*.

Even though the school district knew that the defendant's product would not meet the RFP's specifications, it awarded the contract to the defendant as the low-bidder. After it lost the bid, the plaintiff threatened to sue the school district and the defendant for patent infringement. In response, the school district "rejected all of the bids, withdrew the RFP, and made further changes in the specifications . . . [that were] a departure from the [plaintiff's] patents" and instead described the defendant's product. *Id*. at 1369. The plaintiff did not rebid and the school district again awarded the contract to the defendant based on the same proposed product.

The Federal Circuit held that the defendant's bid was not an infringing offer to sell because **prior** to accepting the defendant's bid, the school district representatives were aware that the defendant's were offering to sell a product that differed from the one that the plaintiff's

21

patent covered.  *Id.* at 1370.  The Federal Circuit also explained that it was "relevant" that the school board withdrew the original RFP and rejected all initial bids.  *Id.*

Unlike the facts in *FieldTurf*, in this case Teva failed to inform purchasers that Gianvi™ does not contain the patented betadex formulation.  In fact, Teva did the opposite and included the presence of the patented betadex feature in its offers to sell Gianvi™, as shown in Teva's launch materials and product insert.  Even if Bayer were to try to get the message out that Teva's product did not contain betadex, customers would rely on Gianvi™'s false package insert to conclude in error that Teva's product did contain betadex.  (Santini Decl. ¶ 11.)  Pursuant to *American Seating* and *FieldTurf*, Teva's offer of sale is of an infringing betadex product.  (Wartel Decl. ¶¶ 15, 18.)

Bayer will likely succeed on the merits of its patent infringement claim.  Teva's offer to sell Gianvi™ infringes the '338 patent.

### C.    Bayer Will Suffer Irreparable Harm If The Court Does Not Restrain And Enjoin Teva

An injury is "irreparable" if "money damages and/or an injunction ordered at final judgment would not rectify that harm."  *Abbott*, 971 F.2d at 16.  However, "[t]he competition of a liar is always dangerous even though the exact injury may not be susceptible of precise proof."  *Abbott*, 971 F.2d at 16 (internal quotation marks and parentheses omitted).  The Seventh Circuit thus recognizes "the well-established presumption" that "injuries arising from Lanham Act violations are irreparable, even absent a showing of business loss."  *Id.* (citing *Int'l Kennel Club Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1091 (7th Cir. 1988)). [9]  This presumption arises

---

[9] For patent infringement cases, the Supreme Court has rejected a presumption of irreparable harm.  *See eBay, Inc. v. MercExchange, L.L.C*, 547 U.S. 388 (2006).

because it is almost impossible to ascertain the precise economic consequences of intangible

harms like the damage to reputation and loss of goodwill.  *Abbott*, 971 F.2d at 16.

Teva's false statements and patent infringement have irreparably harmed Bayer and such

harm will continue unless the Court orders Teva to stop and correct the false statements.  Teva

launched Gianvi™ as a generic alternative to YAZ®.  "The market significance of having a

generic version of a branded product available to drug wholesalers, retail pharmacy chains,

managed care organizations, pharmacy benefit managers and state Medicaid agencies cannot be

over-stated." (Santini Decl. ¶ 5.)  By definition and contractual agreement with its customers,

Teva will undercut Bayer's price.  "Following the launch of a generic product, market share of

the brand quickly erodes as pharmacies begin substituting the generic in place of prescriptions

written for the brand." (*Id.*; *see also* Wartel Decl. ¶¶ 16-17.)  For example, "in July 2008, Teva

launched Ocella®, an authorized generic version of Bayer's oral contraceptive Yasmin®."

(Santini Decl. ¶ 7.)  After just three months, "Ocella® captured approximately 70% of the

market share previously held by Yasmin®, which Bayer has been unable to recapture." (*Id.*; *cf.*

*also* Wartel Decl. ¶¶ 16-17.)

Courts have found actual or threatened price erosion or loss of market share to be

irreparable harm supporting injunctive relief.  *See Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341,

1361-62 (Fed. Cir. 2008) (finding irreparable harm based on "the market share and revenue loss

upon [generic's] entry while the litigation proceeds"); *Sanofi-Synthelabo v. Apotex, Inc.*, 470

F.3d 1368, 1382 (Fed. Cir. 2006) (finding irreparable harm where price erosion and effects on

market position made it "nearly impossible to restore Plavix® to its pre-launch price since the

generic product entered the market"); *Novartis*, 290 F.3d at 595-96 (affirming grant of

preliminary injunction because "[i]n a competitive industry where consumers are brand-loyal, we

23

believe that loss of market share is a 'potential harm which cannot be redressed by a legal or an equitable remedy following a trial'" (quoting *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989))).

In order to compete in a market with a generic, Bayer must "move quickly to point their customers to key differences between the brand and generic, i.e., to show their customers that despite the similarities in the products, the brand product continues to offer significant features and benefits not provided by the generic product." (*Id.* ¶ 6; Wartel Decl. ¶17.) Such "counter-marketing efforts can forestall significant and enduring market share loss to a generic product," but "only if they begin immediately after the generic product's launch and before widespread customer switching occurs." (Santini Decl. ¶ 7; Wartel Decl. ¶ 17.)

A key and indeed fundamental difference between YAZ® and Gianvi™ is Bayer's patented betadex clathrate stabilization technology. (Santini Decl. ¶ 8 ("Because of its extraordinary stability, wholesalers can purchase YAZ® with confidence that they will be able to sell the product before it goes out of date and that the product is more stable than products that do not use betadex. Patients can be confident that they are purchasing a high quality product that resists degradation and loss of efficacy."). Teva's false advertisements that Gianvi™ *also* incorporates and relies upon this key feature "has deprived Bayer of its primary means of distinguishing YAZ® from Gianvi among drugs wholesalers, retail pharmacy chains, managed care organizations, pharmacy benefit managers, state Medicaid agencies and others." (*Id.* ¶11.) Teva has thus "prevented [Bayer] from asserting YAZ®'s key competitive advantage over Gianvi, at the very time when it is most critical that Bayer be able to do so." (*Id.*)

If the status quo is not preserved with a temporary restraining order and injunction, "Bayer's loss of business and market share for YAZ®" will be "irreversible":

24

> In contract negotiations with Bayer customers, some customers have already declined to extend or renew purchase agreements with Bayer for YAZ® because of the availability of Gianvi. Lacking clear and effective means of communicating YAZ®'s superior quality and stability resulting from its betadex formulation, or counteracting Teva's message that Gianvi is the same as YAZ® in all key respects, Bayer has little hope of ever recovering the market share it previously maintained.

(Santini Decl. ¶ 14; Wartel Decl. ¶¶ 20-21.) Again, time is of the essence. "Bayer is currently engaged in negotiations concerning YAZ® with some of its largest customers. These negotiations are on-going and time-sensitive. Bayer's inability to communicate this key distinction between Gianvi and YAZ® is significantly disadvantaging Bayer in these contract negotiations." (Santini Decl. ¶ 15.)

For the same and additional reasons, Teva's patent infringement irreparably harms Bayer. As with its false advertising, Teva's offer to sell a betadex product that infringes Bayer's '338 patent injures Bayer in its counter-marketing efforts against Gianvi™. Furthermore, the patent laws entitle Bayer to a reasonable royalty for Teva's infringement. 35 U.S.C. § 284. But in this case, the calculation of that reasonable royalty is near-impossible because no economically rational parties would agree to a patent license for a fraudulent offer. As Bayer's licensing expert Christopher Vellturo attests, the reasonable royalty damages in this case are not calculable. (Vellturo Decl. ¶¶ 8, 25-30, 31.)

> Established damages methods (such as the *Georgia-Pacific* Factors) undertake to identify and quantify the nature of the economic harm associated with the infringement and to use this harm as the basis for a non-speculative assessment of damages. Here, the irrational and inexplicable nature of Teva's infringing acts defy any ability to use coherent economic methods to address Bayer's damages. Without a reasonable method with which to assess such damages, Bayer is unlikely to obtain such damages as an award in this action. The result is irreparable harm to Bayer should an injunction not be issued.

(*Id.* ¶ 31.)

The inability to come to a reasonable royalty determination further establishes the irreparable harm to Bayer of Teva's patent infringement. *Canon, Inc.*, 263 Fed. Appx. at 62 ("Due to the difficulty (if not impossibility) of determining the damages resulting from price erosion and loss of market share, an award of money damages would not be sufficient.").

### D. The Balance of Harms Strongly Favors Bayer

Teva will suffer no "irreparable harm" through the issuance of a temporary restraining order and preliminary injunction. At most, it will experience some inconvenience as it reissues its Gianvi™ product with a *truthful* package insert and replaces the false package inserts in the field. Teva may also experience some embarrassment as it corrects the misrepresentation it chose to make about its product. All of this Teva brought on itself. "[W]hen the potential harm to each party is weighed, a party can hardly claim to be harmed where it brought any and all difficulties occasioned by the issuance of an injunction upon itself." *Kos Pharma., Inc. v. Andrx Corp.*, 369 F.3d 700, 728 (3d Cir. 2004) (internal quotation marks and brackets omitted). Courts recognize that the injury a defendant may suffer if an injunction were imposed "may be discounted by the fact that the defendant brought that injury upon itself." *Id.*; *see also Novartis*, 290 F.3d at 596; *W.L. Gore & Assoc. v. Totes Inc.*, 788 F. Supp. 800, 810 (D. Del. 1992) ("[A]ny 'prejudice' which accrues [to the defendant] can be considered to be self-inflicted.").

Teva has no protectable interest in continuing to falsely advertise Gianvi™ or infringe Bayer's patents. A party "can assert no equitable interest in the perpetuation of an advertising campaign that is literally false." *Zeneca Inc. v. Eli Lilly & Co.*, No. 1:99-cv-01452, 1999 WL 509471, at *41 (S.D.N.Y. July 19, 1999) (internal quotation marks omitted). This is particularly true in the context of a falsely advertized prescription drug. *See id.* ("Eli Lilly will merely be relegated to promoting Evista for its only approved use, prevention of osteoporosis.").

26

**E.      The Public Interest Weighs Heavily In Favor Of An Injunction**

While not dispositive, the public interest is an important factor weighing in favor of an injunction in this case.  *See, e.g.*, *Abbott*, 971 F.2d at 12, n.3.  Bayer is not asking this Court to prevent Teva from marketing Gianvi™ entirely.  Instead, Bayer asks only that Teva **truthfully** advertise and promote this prescription drug and correct the confusion its previous false advertising has sown.  The public interest will not be disserved in this case by preventing Teva from falsely advertising Gianvi™.  "In fact, such relief would serve, rather than disserve, the public interest in truthful advertising, an interest that lies at the heart of the Lanham Act."  *Id.* at 19; *see also Kos Pharma.*, 369 F.3d at 730 ("The most basic public interest at stake in all Lanham Act cases" is "the interest in prevention of confusion, particularly as it affects the public interest in truth and accuracy.").

False advertising disserves the public interest in any context.  *See Promatek Indus.*, 300 F.3d at 813-14 (injunction which prevents consumer confusion in the marketplace serves the public interest).  Moreover, Teva chose to falsely advertise a prescription pharmaceutical.  As the Second Circuit explained, "[i]n ordinary commercial affairs, substitution by deception' is wrongful, but, when in the healing art there is substitution by deception, greed may reach the grade of malice."  *Upjohn Co. v. Schwartz*, 246 F.2d 254, 262 (2d Cir. 1957) (internal quotation marks omitted); *see also Novartis*, 290 F.3d at 597 ("We agree with those district courts that have found that there is a strong public interest in the prevention of misleading advertisements, and this interest is particularly strong where over-the-counter drugs are concerned.") (internal quotation marks omitted).

The public also has an interest in the enforcement of patent rights, and here that interest also weighs in Bayer's favor as the patentee.  *Abbott*, 544 F.3d at 1362-63 (crediting "public interest in encouraging investment in drug development and protecting the exclusionary rights

27

conveyed in valid pharmaceutical patents" in upholding preliminary injunction) (citing *Sanofi-Synthelabo*, 470 F.3d at 1383).

## CONCLUSION

For all of the foregoing reasons, Bayer respectfully requests that the Court restrain and enjoin Teva from falsely or misleadingly promoting or advertising Gianvi™ as using a betadex formulation, and order Teva to issue corrective advertising for its product already in the field.

DATED: June 15, 2010                          Respectfully submitted,

                                              BAYER SCHERING PHARMA AG
                                              BAYER HEALTHCARE PHARMACEUTICALS INC.


                              By:    /s/ Adam K. Mortara
                                     Adam K. Mortara


                                     Peter B. Bensinger, Jr.
                                     Adam K. Mortara
                                     Paul J. Skiermont
                                     Matthew R. Ford
                                     BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
                                     Courthouse Place, Suite 300
                                     54 West Hubbard Street
                                     Chicago, Illinois 60654

                                     Tel.   (312) 494-4400
                                     Fax   (312) 494-4440

                                     Saul Perloff (*Pro Hac Vice pending*)
                                     Katharyn Grant (*Pro Hac Vice pending*)
                                     FULBRIGHT & JAWORSKI L.L.P.
                                     300 Convent Street, Suite 2200
                                     San Antonio, Texas 78205
                                     Tel.   (210) 224-5575
                                     Fax   (210) 270-7205

                                     *Attorneys for Plaintiffs Bayer Schering Pharma AG
                                     and Bayer HealthCare Pharmaceuticals Inc.*

<u>**CERTIFICATE OF SERVICE**</u>

I, Adam K. Mortara, an attorney, hereby certify that a true and correct copy of the

foregoing document entitled **BAYER'S MEMORANDUM IN SUPPORT OF ITS MOTION**

**FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

was electronically filed with the Clerk of the Court for the Northern District of Illinois using the

CM/ECF System on June 15, 2010.

By:     <u>/s/ Adam K. Mortara</u>
          Adam K. Mortara