## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| BAYER SCHERING PHARMA AG and BAYER HEALTHCARE PHARMACEUTICALS, INC., | ) ) ) ) |
| | ) Judge Virginia M. Kendall |
| Plaintiffs, | ) ) Magistrate Judge Morton Denlow |
| | ) |
| v. | ) Civil Action No. 1:10-cv-3697 |
| | ) |
| TEVA PHARMACEUTICALS USA, INC., BARR PHARMACEUTICALS LLC, and BARR LABORATORIES, INC, | ) ) ) ) |
| Defendants. | ) ) |

**DECLARATION OF DR. MARILYN C. JEROME, M.D. IN SUPPORT OF TEVA PHARMACEUTICALS USA, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER**

I, Marilyn C. Jerome, M.D., declare as follows:

1.      I am an obstetrician/gynecologist, currently engaged in the private practice of gynecology in Washington D.C. at Foxhall OB-GYN Associates.  I am also a Clinical Professor in Obstetrics and Gynecology at The George Washington University School of Medicine in Washington, D.C.

2.      I received a bachelor of science degree in natural sciences from Xavier University in 1974 and my medical degree from the University of Cincinnati in 1978.

3.      Following medical school, I completed an internship and residency in Obstetrics and Gynecology at The George Washington University School of Medicine.

4.      I am actively licensed in the District of Columbia.  I am Board Certified by the American Board of Obstetrics and Gynecology.

5.      I have been actively engaged in the clinical practice of obstetrics and gynecology since I began my residency in 1978.  Within the past ten years, I have focused exclusively on the practice of gynecology.  I have, since graduating from medical school, regularly prescribed and counseled patients regarding oral contraceptives, and I continue to do so today.

6.      My curriculum vitae is attached as Exhibit 1.

## I.      Background Regarding The Current Lawsuit

7.      I have been informed that Bayer Schering Pharma AG and Bayer Healthcare Pharmaceuticals, Inc. (collectively referred to as "Plaintiffs") filed a lawsuit against Teva

Pharmaceuticals USA, Inc.[1] ("Teva") claiming: (1) Teva has falsely advertised Gianvi™, Teva's

generic form of Plaintiffs' Yaz® monthly oral contraceptive product; and (2) Teva infringes one

or more claims of U.S. Patent No. 5,798,338 (the "'338 patent").

**II.    Physicians Do Not Prescribe Yaz® Because Of The Betadex Formulation Or The Shelf Life**

8.      I have reviewed the current prescribing information for Yaz® and Gianvi™.

Both of these drug products contain the same active ingredients (3 mg of drospirenone and 0.02

mg of ethinyl estradiol). The prescribing information for Yaz® states that the ethinyl estradiol in

Yaz® is stabilized by betadex as a clathrate (molecular inclusion complex). Although the

prescribing information for Gianvi™ likewise states that the ethinyl estradiol in Gianvi™ is

stabilized by betadex as a clathrate (molecular inclusion complex), I understand that Gianvi™

does not in fact contain any betadex. I further note that the package insert for Gianvi™ (which is

the information that is provided to the patient) correctly describes the Gianvi™ product.

9.      I have been told that betadex clathrate is a stabilizing agent that Bayer is claiming

improves the stability of the active ingredients in Yaz®. I have never prescribed Yaz® for this

supposed feature, and I do not believe that any of my patients have taken Yaz® because it

contains betadex. Rather, my primary consideration is that Gianvi™ has been FDA-approved as

a safe and effective generic of Yaz®. I do not believe that the presence or absence of betadex in

Gianvi™ has any impact on its safety or efficacy as an oral contraceptive.

10.     The stability of an FDA-approved oral contraceptive is not something that I, or

my patients, typically take into consideration. Rather, what is material is the date of expiration

---

[1] I have been informed that Barr Laboratories, Inc. is listed as the sponsor for the Abbreviated New Drug Application to make a generic version of Yaz®. Barr is an indirect, wholly owned subsidiary of Teva Pharmaceuticals, USA, Inc. For the sake of simplicity, I will refer to each of these corporate entities, both individually and collectively, as "Teva."

and safety of the drug.  I understand that the shelf life of Yaz® is 5 years and the shelf life of Gianvi™ is 18 months.  This difference in shelf life would not influence me to have my patients take Yaz® over Gianvi™.  In fact, the typical shelf life of combination oral contraceptive product is about 18 months.

11.     Every oral contraceptive pill pack is stamped with an expiration date.  I believe the vast majority of my patients would check the expiration date before taking any oral contraceptive pills from a pack that has been in their possession for more than several months.  Moreover, it is highly unlikely that *any* women will have Gianvi™ oral contraceptive pill packs in their possession for more than a year without taking them.  When I prescribe an oral contraceptive, my expectation is that women will take the drugs in each pill pack within the first few months of having their prescription filled.

12.     Oral contraceptives, including Gianvi™, have to be taken daily and on a regular basis.  I prescribe an oral contraceptive to be dispensed for 6 months for new patients and for 12 months for existing patients.  A shelf life of 18 months would therefore not be problematic because I expect that my patients will return to me for a new prescription at least every 12 months.  An oral contraceptive such as Gianvi™ is not the type of drug that would typically sit on the shelf in a woman's medicine cabinet for a year or more.

III.    **Any Disruption In The Sales Of Gianvi™ Would Be Harmful To Patients**

13.     I understand that Bayer has requested that the court order Teva to cease sales of Gianvi™ because of the error in the prescribing information related to betadex.  In my opinion, a disruption in the sales of Gianvi™ could be harmful to women.

14.     It is my belief that generic oral contraceptive products provide an important benefit to a number of my patients. In my practice, I am often confronted with patients who desire to switch to generic oral contraceptive products because of the high cost of some of the branded products, including specifically Yaz®.

15.     When given the option, the majority of my patients choose to take a generic drug product when it is available. If a generic is on the market, the pharmacy may substitute, and in some states is required to substitute, the generic drug product for the brand version unless the prescribing physician makes a notation on the prescription that specifically tells the pharmacy not to make the substitution. It is therefore likely that some women have already received packs of Gianvi™.

16.     In my opinion, if women are unable to refill their prescriptions for Gianvi™, or if they learn that there has been a disruption in sales through the media, they would assume that there is a safety issue with the drug. This is particularly likely in light of the recent press about Yaz® regarding the increased risk of thromboembolism and cardiovascular side effects. In the past year, a number of my patients have contacted me to determine the nature of the reported safety concerns. I have researched these reported risks myself, and I continue to believe that Yaz® is a safe drug. However, about ten percent of my patients have requested to switch to another oral contraceptive due their concerns about the safety of Yaz®.

17.     In my opinion, the chance of my patients learning about a disruption in sales of Gianvi™, either through the media or by word of mouth, and then immediately discontinuing Gianvi™ mid-cycle due to concerns about the safety of the product is significant. *See Modern Contraception: Updates From the Contraception Report* 79 (David Grimes et al. eds., 1997)

("Even the *perception* of side effects can lead to noncompliance."). It is known that patients who perceive that an oral contraceptive causes substantial health-related problems are least likely to continue to use it. *See id.* ("Among women who stop using oral contraceptives, side effects or fear of potential side effects are cited as the most frequent reasons for method discontinuation.").

18.     I believe that a disruption in the sales of Gianvi™ will create substantial confusion.  At a minimum, I believe there will be a number of patients who will be confused about the circumstances surrounding the unavailability of Gianvi™, and may stop taking the product until they can better understand the situation either through doing their own research or by consulting with their physicians.  Patients are likely to question whether they should continue their current pill pack, start a new pill pack of a replacement monthly oral contraceptive product, or try to switch to Yaz® and start the pack in the same place.

19.     In my opinion, there will be a number of patients who will be confused about the circumstances surrounding a halt in the sales of Gianvi™, and may be reluctant to switch back to Yaz® for fear that a safety issue may exist with both products.  However, in order for patients to switch from one type of monthly oral contraceptive to another, they must get a new prescription from their physician.   In my experience, when patients discontinue the monthly oral contraceptive I have prescribed for them, they often do not act promptly in contacting me for another prescription, and may not even mention it until their next scheduled appointments.  As a result, these patients will likely fail to start their next oral contraceptive pill cycle on time.

20.     For patients who are taking monthly oral contraceptives, a break or discontinuation of the regimen increases the risk of unintended pregnancies.  In order for monthly oral contraceptives to prevent pregnancy, women must strictly adhere to the regimen of

their prescribed combined oral contraceptive.  Research indicates that compliance with monthly oral contraceptive regimens is less than perfect even in situations when women are not forced to make a product switch due to a halt in sales.  *See* Jennifer L. Woods et al., *Patterns of Oral Contraceptive Pill-taking and Condom Use Among Adolescent Contraceptive Pill Users*, 39(3) Journal of Adolescent Health, 381, 382 (2006) ("Even among women who continue OCP use, daily OCP pill-taking can be difficult.  Up to 60% of adult users report missed doses and up to 50% miss enough doses to place them at risk for pregnancy.").

21.    In my opinion, the potential consequences of a patient deviating from an oral contraceptive regimen can be far more significant than with many other prescription drugs.  If a woman is not in compliance with the oral contraceptive regimen, the risk of an unintended pregnancy is greatly increased.  *See Modern Contraception, supra*, at 78 ("Reducing the user failure rate by just one percentage point (e.g., from 3% to 2%) *would prevent at least 630,000 accidental pregnancies each year worldwide*—nearly 170,000 in the U.S. alone.").

22.    The most likely time to lose contraceptive effectiveness is when a woman starts an oral contraceptive pill cycle late, even if it is only by one or two days.  *See* Woods et al., *supra*, at 381-82 ("Variable patterns of OCP pill-taking during periods of transition into and out of OCP use may make these especially vulnerable times in terms of method adherence."); *Modern Contraception, supra*, at 80-81 ("[T]here is an increased risk of follicular development and possibly ovulation and pregnancy if pills are missed at the beginning of a new cycle. . . .  In fact, missing even one [pill] at the beginning or end of a cycle may increase the risk of follicular development and possible escape ovulation.").

23.    Being off the active pills for seven or more days at any point during the pill cycle significantly increases the chance of an unintended pregnancy. *See id.* ("Most women do not understand that extending the pill-free interval beyond the usual 7 days is particularly critical."); B.G. Molloy et al., *"Missed Pill" Conception: Fact or Fiction?*, 290 BR. MED. J. 1474, 1475 (1985) ("Women using oral contraceptives should also be warned of the danger of delaying restarting treatment after the seven pill free days."). Therefore, women who discontinue Gianvi™ because they cannot obtain a refill will have a very small window of time in which to resume monthly oral contraception without risking an unintended pregnancy.

24.    If patients who discontinue Gianvi™ do not switch to another monthly oral contraceptive without delay, they must use a form of back-up birth control if they are sexually active. According to published studies regarding women who discontinue taking their monthly oral contraceptives, women often do not immediately switch to another form of birth control. *See* James Trussell & Barbara Vaughan, *Contraceptive Failure, Method-Related Discontinuation and Resumption of Use: Results From the 1995 National Survey of Family Growth*, 31(2) Family Planning Perspectives, 64, 69 (1999) (reporting that after discontinuing a reversible contraceptive, only 68% of women resume use of a method within one month and 76% do so within three months). Moreover, many women do not consistently use dual contraceptive methods such as oral contraceptives and condoms, which would, if used properly, help protect them from unintended pregnancies during breaks in oral contraceptive use. *See* Woods et al., *supra*, at 381 (reporting that fewer than 25% of adolescents use dual contraceptive methods). Further, monthly oral contraceptives are one of the most effective forms of reversible birth control. Switching to another form of reversible contraception, particularly one that does not

require a prescription (such as condoms or other barrier methods), would increase the risk of unintended pregnancies.

25.     In my opinion, halting the sales of Gianvi™ would only compound the problem that many women have in consistently following an oral contraceptive pill regimen. *See* Linda S. Peterson et al., *Women's Efforts to Prevent Pregnancy: Consistency of Oral Contraceptive Use*, 30(1) Family Planning Perspectives, 19, 22 (1998) (reporting on a study finding that 16% of sexually active contraceptive users are inconsistent in their pill-taking). The impact would also be disproportionately greater on certain groups of women who already have greater issues with contraceptive compliance. *See id.* (suggesting that low-income women may have difficulty obtaining both oral contraceptive pills and condoms, and may fail to obtain new pill packages on time); *Modern Contraception, supra,* at 81 (noting that teenagers may have more trouble taking oral contraceptives correctly than do older patients).

26.     I am aware that fifty percent of pregnancies in the United States are unintended. *See id.* A disruption in the sales of Gianvi™ could increase the number of unintended pregnancies. There are substantial health risks associated with pregnancy in comparison to oral contraceptive use. In fact, pregnancy is associated with a higher mortality rate than oral contraceptive use in non-smokers. *See* L. Speroff & P. Darney, *A Clinical Guide For Contraception*, 60 (3rd ed. 2001). Women who have an unintended pregnancy are faced with serious decisions about continuation with an unplanned pregnancy versus pregnancy termination. Unintended pregnancies create a number of avoidable health risks and psychological effects. *See* R. Russell and C. Kingsland, *The Risks and Benefits of the Combined Oral Contraceptive Pill*, 38 J. R. Coll. Physicians Edinb. 224, 225 (2008) (("Pregnancy, particularly when repeated and complicated, presents a significant risk to female health.").

27.     Oral contraceptives have been on the market for over fifty years.  Their safety and efficacy is well-documented.  In my opinion, the disruption in sales of a safe and effective monthly oral contraceptive is unnecessary.

I declare under penalty of perjury my belief that the foregoing is true and correct.

Executed on June 16, 2010

_____
Marilyn C. Jerome, M.D.

# EXHIBIT 1

# Marilyn C. Jerome, M.D.

Office: 4910 Massachusetts Avenue, N.W. #112
      Washington, DC 20016
      202-244-3523
      202-966-8441 Fax

Home: 7822 Swinks Mill Court
      McLean, Virginia 22102
      703-790-1311
      202-309-2619 Cell

E-mail: mjeromegyn@aol.com

## Professional Experience

1982-present: Foxhall OB/GYN Associates, P.C., Washington, DC
Private practice in Obstetrics and Gynecology, 1982-2000
Private practice in Gynecology 2000-present

## Education

1970-74 Xavier University, B.S. Natural Sciences
      Summa cum laude
      Alpha Sigma Nu Honor Society

1974-78 University of Cincinnati College of Medicine, M.D.
      Alpha Omega Alpha Honor Society

1978-82 George Washington University Hospital
      Residency in Obstetrics and Gynecology

## Accreditation

1984 American Board of Obstetrics and Gynecology

2005 International Society of Clinical Densitometry

## Teaching Appointments

George Washington University
      1982-1987 Associate Clinical Professor of Obstetrics and Gynecology
      1987-1992 Assistant Clinical Professor of Obstetrics and Gynecology

1992-2004, 2009- present, Clinical Professor of Obstetrics and Gynecology
2009-present Global Health Track, mentor

Northeastern University and Temple University 2000-2005
    Temporary appointments to instruct physician assistant students

## *Hospital Affiliations*

1982-2004 George Washington University Hospital

1998-present Sibley Memorial Hospital
    Cancer Committee 2005-present

## *Professional Memberships*

American College of Obstetrics and Gynecology, fellow
District of Columbia Medical Society
American Medical Association
International Society of Clinical Densitometry
American Association of Gynecological Laparoscopists

## *Board Appointments*

Capital Physicians Network
George Washington University Hospital, Board of Trustees, 1997-2000
George Washington University Hospital, Credentials Committee, 1997-2000
Jesuit Refugee Service, Board of Directors, 2002-2010
    Secretary, 2009-2010
    Executive Committee 2006-2008
    Program Committee, Chair 2004-2008
    Nominating Committee, Chair 2004-2008
    Ad Hoc Subcommittee on Boarder Ministry
Children of God Relief Fund, Board of Directors, 2002-present
    Annual Benefit Committee 2004-2007
    President, 2008-present
Pro-Assurance Physician Advisory Board, 2010

## *Personal Recognitions and Awards*

Washingtonian Magazine Best Doctors in Obstetrics and Gynecology
Consumer Checkbook Best Doctors
The Best Doctors in America

### Community Service

Fairfax County Health Department, Medical Reserve Corps

### Personal Information

Born: April 10, 1952

Married: John William Foust, J.D., Supervisor, Fairfax County Board of Supervisors

Children: Matthew (age 24) and Patrick (age 21)